**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TONYA N. STOTTLAR,**

                             **Plaintiff,**

       **v.**                                       **5:13-cv-00047**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,[1]**

                           **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION AND ORDER

### I.    INTRODUCTION

      Tonya N. Stottlar ("Plaintiff" or "the claimant") brought this suit under the Social

Security Act ("the Act"), 42 U.S.C. §§ 405(g), 1383(c) to review a final determination of the

Commissioner of Social Security ("Commissioner") denying her applications for disability

and disability insurance benefits ("DIB") under Title II, and supplemental security income

under Title XVI.  Plaintiff argues that the decision of the ALJ denying her applications for

benefits was not supported by substantial evidence and was contrary to the applicable

legal standards.  The Commissioner argues that the decision was supported by

substantial evidence and made in accordance with the correct legal standards. Pursuant

to Northern District of New York General Order No. 8, the Court proceeds as if both

---

[1]On February 14, 2013, Carolyn W. Colvin took office as Acting Social Security Commissioner. She
has therefore been substituted as the named defendant in this matter pursuant to Rule 25(d)(1) of the
Federal Rules of Civil Procedure.

parties had accompanied their briefs with a motion for judgment on the pleadings.

## II. PROCEDURAL HISTORY

On January 23, 2008, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits. Plaintiff also protectively filed a Title XVI application for supplemental security income on January 23, 2008. In both applications, Plaintiff alleged disability beginning July 4, 2006.  These claims were denied initially on May 30, 2008.  Thereafter, Plaintiff filed a written request for hearing on June 16, 2008 (20 CFR 404.929 et seq. and 416.1429 et seq.).  Subject to informal remand, the application was returned to the State Agency level for further development and determination. The State Agency determined that the claim could not be approved and returned it to the hearing level.  On January 7, 2010, a hearing was held at which Plaintiff's testimony was taken.  The Administrative Law Judge ("ALJ") issued a "Notice of Decision-Unfavorable" on June 7, 2010, denying Plaintiff's applications.  Plaintiff appealed this decision by filing an administrative Request for Review of Hearing Decision/Order, dated August 6, 2010, with the Appeals Council.  The Appeals Council denied Plaintiff's request for review on November 13, 2012.  The instant appeal to this Court followed.

## III. FACTUAL BACKGROUND

The parties do not dispute the underlying facts of this case as set forth by Plaintiff in her memorandum of law.  Accordingly, the Court assumes familiarity with these facts and will set forth only those facts material to the parties' arguments.

## IV. THE COMMISSIONER'S DECISION

The ALJ made the following findings:

**1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.**

**2. The claimant has not engaged in substantial gainful activity since July 4, 2006, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).**

**3. The claimant has the following "severe" impairments: bilateral de Quervain's tenosynovitis; major depressive disorder; and anxiety disorder, not otherwise specified (20 CFR 404.1520(c) and 416.920(c)).**

The ALJ found that Plaintiff's allegation of disabling symptoms from back pain is not supported by the record; that Plaintiff's obesity is not "severe" in that it does not more than minimally affect her ability to engage in work activity; and that Plaintiff's borderline diabetes is not a "severe" impairment.

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

The ALJ considered listing 1.02(B), which requires involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand) resulting in inability to perform fine and gross movements effectively, however he found the severity of Plaintiff's impairment did not rise to the level contemplated by the listing as shown by her ability to prepare simple meals and feed herself and perform personal hygiene.

The ALJ also found Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04. In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied.[2]  The ALJ adopted the determination of the

---

[2]To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1

(continued...)

psychology consultant who reviewed the file at the State agency level, and determined:

In activities of daily living, the claimant has mild restriction. The claimant's treating psychiatrist, Thomas Schwartz, M.D., observed that the claimant appeared her stated age when presenting for appointments (Exhibits 7F and 28F). The claimant told Jeanne Shapiro, Ph.D., who examined her for the Administration in April 2008 that she was able to work, depending on the position (Exhibit 12F). On examination, the claimant looked her stated age and was appropriately dressed with good hygiene and grooming. The claimant reported that she was able to bathe, dress and groom on a daily basis. The claimant said that she did limited food preparation, cooking, cleaning, laundry, and shopping, drove a little, and did not use public transportation. However, the claimant independently maintained herself and her three children in the community.

In social functioning, the claimant has moderate difficulties. Dr. Schwartz found the claimant cooperative during evaluations, with normal speech and no abnormal movements and good eye contact, although her affect was sometimes dysphoric, constricted and congruent (Exhibits 7F and 28F). The claimant told Dr. Shapiro that she did not like being around people very much and would need a job where she was away from people (Exhibit 12F). The claimant said that socially she got along well with friends and family some of the time. On examination, the claimant's demeanor and responsiveness to questions was cooperative. Her manner of relating, social skills, and overall presentation were adequate. Her gait, posture, and motor behavior were normal. Her eye contact was appropriate. Her expressive and receptive language skills were adequate. In September 2009, Dr. Schwartz indicated that the claimant was experiencing panic attacks and agoraphobia (Exhibit 28F); however, other than the claimant's subjective reports to the doctor, there is no evidence in the record.

With regard to concentration, persistence or pace and giving the claimant the benefit of doubt, the claimant has mild to moderate difficulties. The claimant complained of difficulty concentrating. Dr. Schwartz stated that the claimant's attention and concentration were normal and that her thought processes were fully organized (Exhibits 7F and 28F). The claimant told Dr. Shapiro that she obtained a G.E.D. and was in regular education in school (Exhibit 12F). On examination, the claimant's thought processes were coherent and goal-directed, attention, concentration, and memory skills were intact. The claimant said that she could manage money.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The claimant told Dr.

---

[2](...continued)
year, or an average of once every 4 months, each lasting for at least 2 weeks.

Shapiro that she had no psychiatric hospitalizations (Exhibit 12F). There is no evidence of any psychiatric admissions in the record.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(Tr. 31-32).

The ALJ also found that the evidence failed to establish the presence of the

"paragraph C" criteria. (Tr. 32-33). The ALJ concluded:

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impainnents (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 33).

**5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can perform handling and fingering frequently, defined as up to two-thirds of the workday, but not continuously (repetitively). Mentally, the claimant can understand, remember, and carry out simple instructions, respond appropriately to supervision, coworkers and usual work situations, on a sustained basis, and deal with changes in a routine work setting.**

In making this determination, the ALJ indicated that he "considered all symptoms

and the extent to which these symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence, based on the requirements of 20 CFR

404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered

opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927

and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 33). The ALJ also indicated:

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

(Tr. 33).

In his decision, the ALJ noted that Plaintiff testified that the most significant condition that kept her from working was her wrist impairment that caused pain, swelling, and difficulty grasping. Plaintiff stated that her wrists went weak and numb sometimes causing inability to feel the object in her hand and, consequently, she dropped the object. She said that she tried several different types of splints; however, they didn't help and she no longer wore them. She confirmed that she prepared meals, performed light housework, and could take care of her personal hygiene. She said that she could tie shoelaces, but not button a coat. She asserted that she could not write a full sentence and was limited in computer use. She contended that her medications did not help but she continued to take them because she feared her condition would be worse without them. She stated that at the onset of her impairment she could not lift eight to ten pounds and her condition progressed since then. She testified that she could stand one hour and walk one mile on level ground. She further testified that she had anxiety and depression and had received mental health counseling for five or six years. When questioned regarding improvement in

symptoms during that time period, Plaintiff responded that she went from being suicidal to non-suicidal. She said that her anxiety interfered at times with driving. She stated that there were days when she would not leave the house and did not go anywhere except appointments, and that she tended to hibernate and hide from everybody. She testified that she had difficulty sleeping. She said that she had no drug and alcohol history.

The ALJ found that "[t]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment." (Tr. 34). The ALJ noted:

> The records indicate that the claimant walked her dog, although complaining that it exacerbated her symptoms (Exhibit 1F, page 7), suggested computer online courses, which her doctor thought was an "excellent" idea, and engaged in reading, all of which requires use of the hands for gross and fine motor skills. Symptom exaggeration was noted by treating and examining sources. The claimant's occupational therapist noted symptom exaggeration was evident since the claimant was independently driving and independently completing activities of daily living (Exhibit 1F, page 8). The therapist also noted that the claimant's symptoms were not changing with therapy services and the complaints were "very generalized." Also noted was that there was no discernible pattern for the claimant's symptoms. When examined by Daniel Carr, M.D., for the purposes of Workers' Compensation in December 2006, the claimant stated that after an hour of work, her hands would be swollen and painful, which progressed to burning and aching up to her elbows (Exhibit 4F). The doctor asked what activities at work caused these symptoms. The claimant responded that she could not specify the activities and stated that, because the symptoms occurred at work, she assumed it was work-related. The claimant stated that her symptoms were worsening. The doctor stated that the claimant had chronic nonspecific upper extremity symptoms that made no sense from any orthopedic abnormality because her symptoms did not follow any known anatomic pattern. He stated that she had "obvious submaximal effort" on exam, demonstrated by her grip testing with a grip dynamometer showing she generates zero grip strength with both hands. Dr. Carr stated that there was no explanation from an orthopedic or organic point of view as to why her symptoms would be worsening when she had not been working. The claimant presented for a functional capacity evaluation in February 2010 which was deemed invalid because of very

poor effort on the claimant's part (Exhibit 32F). The undersigned also notes that the claimant testified that she had no drug and alcohol history; however, the record shows that in January 2006 the claimant reported that after she evicted her husband she drank to intoxication almost daily and for six months prior to the evaluation she confmed her drinking to weekends, but had not drank since New Years' Eve (Exhibit 27F). Xenia Becher, L.M.S.W, listed an Axis I diagnostic impression of depressive disorder and alcohol abuse.

(Tr. 34).

The ALJ further noted:

In terms of the claimant's alleged disabling symptoms, the objective medical evidence does not support a finding of "disabled." The claimant complained of bilateral wrist pain that was deemed work-related in October 2005 (Exhibit 5F). She alleged that she was unable to open jars or cans, vacuum, complete household chores, had difficulty with dishes, frequently dropped objects, couldn't lift a coffee cup without burning herself or push herself up from sitting to standing, and that cold temperatures, including the use of ice and weather-related coldness, increased her pain enough to "cut her arms off" (Exhibit 1 F).

(T. 34-35).

The ALJ assessed the following facts and opinions that impacted his RFC determination. An EMG study ordered by Plaintiff's primary care physician, Keith Harden, M.D., was normal. Dr. Harden referred Plaintiff to Allan Smiley, M.D., a rheumatologist. Dr. Smiley made no diagnosis and referred Plaintiff to Occupational Medicine for a consultation. Sven Ljaamo, M.D., upon observing on examination a positive Finklestein's test bilaterally and moderate tenderness and distal weakness, diagnosed de Quervain' s tenosynovitis, which he opined was likely related to overuse of her hands and wrists at work and had been inadequately treated. Dr. Ljaamo referred Plaintiff to Denny Battista, D.O., for pain management. Dr. Battista ordered braces for Plaintiff and scheduled her for bilateral cortisone injections. Plaintiff reported minimal relief but complained of persistent bilateral numbness and tingling in her hands.

Edward Sugarman, M.D., performed an independent medical examination of Plaintiff in July 2006 for Workers' Compensation. At the time, Plaintiff had returned to work part-time at ten hours a week. The doctor observed that Plaintiff's general passive range of motion was good and she could bring her thumbs to each of the remaining four fingers. Plaintiff complained of pain at the base of the thumb bilaterally; however, Dr. Sugarman did not feel a marked degree of effusion. The Finklestein's test was positive on both sides, and Dr. Sugarman noted diffuse swelling across the wrists on both hands. He limited Plaintiff to no repetitive activities or heavy lifting. He opined that she could not work full-time and that a period of temporary disability would continue probably for another three to six months.

Dr. Smiley noted in August 2006 that Plaintiff had marked tenderness to both wrists, and he encouraged her to go to vocational rehabilitation for evaluation and retraining. Plaintiff suggested on-line computer schooling, which Dr. Smiley thought was an excellent idea.

An EMG performed in October 2006 revealed severe axonal loss involving the bilateral median and ulnar motor nerves, which Dr. Battista stated correlated with denervation seen in the C7-8 musculature in both arms as well as within the cervical paraspinal region. Dr. Battista requested authorization for an MRI of the cervical and thoracic spine. However, the MRI of the thoracic spine was negative, and the MRI of the cervical spine showed straightening of lordosis and was otherwise negative. Dr. Battista informed Plaintiff that her presentation and findings were "confusing." He recommended an epidural injection to determine if it resolved her symptoms.

Dr. Carr, who performed an independent medical examination for Workers'

9

Compensation in December 2006, questioned whether Plaintiff even had a work-related injury and de Quervain's tenosynovitis and recommended termination of services. Dr. Carr observed some suggestion of de Quervain on examination; however, he stated that it was difficult to make any determination whether she had any organic problem with all of the other symptoms that did not fit the pattern of de Quervain. Dr. Carr determined that Plaintiff's impairment was not work-related because Plaintiff had not been working yet complained that her symptoms were worsening. He stated that if her symptoms were due to overuse at work, and she was not working, her symptoms should improve. He also stated that it was not clear how it was ever deemed a work-related condition just because Plaintiff had symptoms at work, the first EMG study in November 2005 was normal, and Plaintiff had not been working prior to the second study, which was abnormal, suggesting that Plaintiff's symptoms were home-related, rather than work-related. He determined that there was no further treatment required for a work-related claim, and that she could return to full duty.

In April 2008, Plaintiff presented to John Fatti, M.D., for a Scheduled Loss of Use Evaluation. Previously stating that Plaintiff had a seven percent permanent loss to her hands and wrists bilaterally, Dr. Fatti classified Plaintiff with a mild to moderate permanent partial disability to both hands and wrists and opined that she should not work heavily or repetitively with either upper extremity. Muftah Kadura, M.D., completed a range of motion chart for the Administration indicating that Plaintiff exhibited zero to 50 degree dorsiflexion of the wrist bilaterally and zero to 45 palmar flexion bilaterally.

Kalyani Ganesh, M.D., examined Plaintiff for the Administration in April 2008. Plaintiff told Dr. Ganesh that she cooked a couple of times a week, could shower, bathe

and dress, drove short distances, and that her children, ages 12, 14, and 16, helped her with cleaning, laundry and shopping. She said that her activities included television and reading.  Physical examination showed full range of motion of the spine and extremities with no neurological deficits.  Chest and lungs were normal.  Hand and finger dexterity were intact.  Dr. Ganesh observed some tenderness on the radial aspect of the wrist bilaterally; however, Plaintiff was able to tie a bow, button, zipper, and Velcro with no gross difficulties, and her grip strength was 5/5 bilaterally.

In January 2009, Plaintiff presented to Imtiaz Samad, M.D., stating that Dr. Kadura stopped seeing compensation cases and referred her to another physician who was not to her satisfaction.  Dr. Samad noted that Plaintiff had been getting a lot of pain pills and she wanted him to prescribe her medication.   Dr. Samad advised her to see a physician he recommended.

In February 2009, Plaintiff presented to New York Spine and Wellness Center with complaints of wrist and arm pain.  Plaintiff complained of worsening symptoms and that simple things like washing her hair were difficult. The doctor noted swelling and tenderness along both wrists and positive Phalen's and Tinel's, noting that carpal tunnel had been ruled out by Dr. Fatti.

Plaintiff returned to Dr. Samad in October 2009 stating that the compensation case had been settled and she used the money to buy herself a new car.  Dr. Samad observed that Plaintiff was in no acute distress, her neck was supple with good range of motion, examination of her wrists showed no effusion or inflammation, she was able to extend her wrist joints with minimal discomfort and radially and ulnar deviate her wrists with no significant pain.  Finklestein's test was only minimally positive.  Her  handgrip was normal

bilaterally, and the strength in her upper limbs was 5/5. Dr. Samad told Plaintiff that given her symptoms he thought it unusual that she should be on such strong medication as Oxycodone and that she should try to get herself off the medication. He noted that she was also taking the controlled substance Xanax.

Regarding Plaintiff's mental impairment, the ALJ noted that Plaintiff alleged depression and anxiety with irritable mood, loss of interest in activities, memory problems, and difficulty dealing with others, yet, in February 2007, Plaintiff's depression was in remission and she was doing well with medication and treatment. The ALJ further noted that the mental status examination was unremarkable. Imtiaz Samad, M.D., noted in April 2007 that Plaintiff was on Wellbutrin and Effexor for depression, which was working reasonably well. Dr. Samad stated that Plaintiff used Trazodone and Sonata at night, and that he had a "very lengthy discussion" with Plaintiff about excessive use of medications, counseled her on dependence, and advised her to try and avoid the use of the "street" medications of Trazodone and Sonata.

The ALJ further observed that in May 2007, Plaintiff reported that the "depression has come back for no apparent reason," and her affect was dysphoric and restricted. Dr. Schwartz increased the dosage of Wellbutrin. In July 2007, Plaintiff reported that the medications were helpful, and the mental status examination was unremarkable. The ALJ noted that Plaintiff's mental status examinations remained basically unremarkable; however, Plaintiff alleged problems with sleep, irritability, anger, mood swings, low energy, and fatigue for which medication management was utilized.

The ALJ took note that Jeanne Shapiro, Ph.D., examined Plaintiff for the Administration in April 2008. Plaintiff told Dr. Shapiro that she had difficulty sleeping,

12

decreased appetite, was unmotivated and lethargic, did not go anywhere or do anything, isolated herself from others, had poor concentration and memory, was easily angered and yelled, screamed, threw things, broke things, and wanted to hurt people. However, the mental status examination was basically unremarkable. Dr. Shapiro noted that Plaintiff did not report any significant manic or anxiety-related symptoms, or symptoms of a formal thought disorder.

The ALJ concluded that the weight of the opinion evidence did not support the severity alleged. Under SSR 06-3p, the ALJ reviewed and considered the reports prepared in regard to obtaining VESID services[3] but gave little weight to those reports "because the medical information provided was inconsistent with the objective medical evidence and because the determination of disability is an issue reserved to the Commissioner. (Tr. 37)(citing SSR 96-5p). The ALJ gave significant weight to Plaintiff's examining and/or treating sources, Drs. Samad, Smiley, Sugarman, and Fatti, who all determined that Plaintiff could work, although some placed limitations of no repetitive handwork or heavy lifting. The ALJ gave some weight to the opinion of Dr. Kadura, who

---

[3]A "Background Information and Current Impressions Case Note" was completed at VESID on July 23, 2007. It was concluded that Plaintiff was unable to use her hands and fingers, and was unable to do repetitive or tedious work. The report noted that, according to her physician, she was unable to lift/carry, no prolonged sitting/standing, limited reaching, pushing, pulling, climbing stairs or bending and should avoid strenuous or stressful situations. She reported that she was unable to lift a gallon of milk or do any activities with her upper extremities, such as using a camera or writing. An "Eligibility/Significance of Disability Case Note" was completed the same day. It was noted that Plaintiff's personal interactions were "impaired," due to behavior that was withdrawn, with few or no support systems available. It was state that Plaintiff could "not" meet competitive standards with hand tools and was "unable" to perform tasks requiring fine dexterity, speed or coordination; she was "unable" to perform tasks essential to maintaining employment in her previous job and did not have other work skills; she was unable to tolerate environmental conditions and "must" avoid unprotected heights; she was limited in her ability to work quickly, with limited bending, climbing, kneeling, pushing, pulling, reaching, standing, stooping and stretching; and, she would be unable to lift and carry objects weighing less than ten (10) pounds. It was opined that Plaintiff met the criteria for a "most significant" disability, with three or more functional capacities being "significantly limited."

13

opined in April 2008 that Plaintiff had no limitation to sitting, walking and standing, and

could occasionally lift and carry as much weight as tolerated but was limited from

performing repetitive motions of the wrist.  The ALJ noted that in October 2008, Dr.

Kadura included no prolonged sitting or standing yet found that "those limitations are not

supported by the objective evidence and little weight is granted." (Tr. 37).  The ALJ noted

that "Social Security Ruling 96-2p directs that a medical opinion provided by a treating

physician must be given controlling weight if it is well supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial medical and non-medical evidence in the record. Here, the doctor's opinion is

not supported by the medical evidence and is not []consistent with other credible evidence

as Plaintiff is not diagnosed with any impairment that would limit her ability to sit or stand

(20 CFR 404.1527 and 416.927(d)(2))." (Tr. 37).   The ALJ further concluded:

> A medical consultant, who reviewed the file at the State agency level and
> determined that the claimant could perform light work activity with mild to moderate
> limitations on repetitive hand work, is consistent with the opinions of the claimant's
> treating and examining sources (Exhibit 14F). State agency medical and
> psychological consultants are highly qualified physicians and psychologists who are
> experts in the evaluation of the medical issues in disability claims under the Act
> (SSR 96-6p). The consultant stated that the record shows that the claimant had
> symptoms of pain in both wrists without impairment of range of motion of the wrists
> and fingers. Counsel contends that the consultant's determination is inconsistent
> because in completing the physical residual functional capacity assessment, the
> consultant did not find manipulative limitations, limitations on pushing and/or pulling
> other than as established for lifting and carrying, or place a limitation to avoid
> exposure to extreme cold (Exhibit 16E).  However, the undersigned has taken into
> consideration the consultant's stated opinion that the claimant is limited in
> performing repetitive hand manipulations and gives significant weight to the opinion
> based on consistency with the record and the treating and examining sources. The
> claimant's complaints of pain resulting from exposure to cold temperatures are
> subjective, with no supporting medical documentation. The consultant's opinion is
> consistent with the findings of Kalyani Ganesh, M.D., who examined the claimant
> for the Administration and stated that the claimant had mild to moderate limitations
> with repetitive hand work and no limitation to sitting, standing or walking (Exhibit

14

11F). The undersigned also gives significant weight to Dr. Ganesh's opinion as it is consistent with the longitudinal record.

On February 10, 2010, the claimant underwent a functional capacity evaluation, from which results indicated that the claimant's physical demand level was sedentary to light for an eight hour day (Exhibit 32F). However, as stated above, the therapist stated that according to the Blankenship System Reliability Profile, the claimant exhibited very poor effort, or voluntary submaximal effort, that was not necessarily related to pain, impairment or disability. The validity of the results were considered invalid. Therefore, little weight is given.

As to the claimant's mental impairment, Dr. Shapiro stated that the claimant may have difficulty adequately understanding and following some instructions and directions as well as completing some tasks based on the claimant's complaints of memory and concentration deficits, and may have difficulty interacting appropriately with others due to irritability and anger, and may have difficulty attending work or maintaining a schedule due to lack of motivation and lethargy (Exhibit 12F). The doctor also stated that the claimant did not appropriately manage stress. Little weight can be given to Dr. Shapiro's opinion because it is too speculative. More weight is given to the opinion of the reviewing psychologist at the State agency level, who determined that the claimant had mild to moderate limitations that would not preclude the claimant from performing all work activity (Exhibit 16F).

Significant weight is give to the opinion of Dr. Schwartz, as is consistent with the established residual functional capacity. In December 2009, the claimant's treating psychiatrist, Dr. Schwartz completed a medical source statement, indicating the claimant experienced decreased energy, thoughts of suicide, impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor agitation, apprehensive expectation, autonomic hyperactivity, sleep disturbance, and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week (Exhibit 29F). On the medical source statement, the doctor responded that the claimant had no limitation to understanding, remembering and carrying out simple instructions, mild (defined as a slight limitation, but the individual can generally function well) limitation in the ability to make judgments on simple work-related decisions, moderate (defined as more than a slight limitation, but the individual is still able to function satisfactorily) limitation to respond appropriately with co-workers and respond appropriately to usual work situations and changes in a routine work setting. These limitations do not preclude unskilled work activity. The doctor also responded that the claimant had marked (defined as a serious limitation in which there is a substantial loss in the ability to effectively function) limitation to interact appropriately with the public and with supervisors. However, the doctor's progress notes do not support marked limitations, nor does the claimant's testimony and activities of daily living. Although the claimant reported irritability and anger, as

stated previously, except for dysphoric mood, the claimant's mental status examinations were unremarkable.  In January 2009, the claimant stated that she wanted to discontinue Effexor due to weight gain (Exhibit 28F).  Dr. Schwartz changed the claimant's medications to Abilify, Provigil, Xanax, and Xanax XR.  In September 2009, the doctor reported the claimant's depression as mild, but stated that the anxiety disorder seemed to be escalating toward a panic disorder with some agoraphobic issues, and he increased her Abilify, although the claimant reported decrease in symptoms. In November 2009, the claimant's pain program ended and her primary care physician refused to prescribe Percocet. Dr. Schwartz agreed to taper the claimant off Percocet.  He described the claimant's affect as dysphoric and anxious and noted that she seemed a little less depressed, but was having escalating frank, unprovoked panic attacks and agoraphobia. Other than the claimant's subjective reports, there is no evidence of panic attacks in the record. None of this supports that the claimant cannot interact appropriately with supervisors. The claimant testified that she did not have trouble with supervisors in the past and did not anticipate problems currently as long as there was work she could perform.

In sum, the above residual functional capacity assessment is supported by the weight of the evidence.

(Tr. 38-39).

**6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

**7. The claimant was born on December 10, 1975 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).**

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

In making this determination, the ALJ indicated that:

the claimant retains the ability to perform the basic mental demands of work

16

activity. Only when a claimant's nonexertional impairments significantly diminishes the ability to perform the full range of employment indicated by the medical vocational guidelines does the Commissioner have to introduce the testimony of a vocational expert or other similar evidence that jobs exist in the economy which the claimant can perform (*Bapp v. Bowen*, 802 F.2d 601 (2d Cir. 1986)). As the medical vocational guidelines address the numbers of unskilled jobs in the economy and the claimant retains the ability to perform unskilled work, vocational expert testimony is not necessary.

If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule and SSR 85-15.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from July 4, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

In this regard, the ALJ concluded:

Based on the application for a period of disability and disability insurance benefits protectively filed on January 23,2008, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on January 23, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 41).

## V.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries.

*See* 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied

the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999);

*Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d

Cir. 1990); *Shane v. Chater*, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16,

1997)(Pooler, J.)(citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. *See Tejada*, 167 F.3d at 773; *Balsamo*, 142 F.3d at 79; *Cruz*, 912 F.2d at 11; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also, Perez*, 77 F.3d at 46; *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine de novo whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted). In the context of Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.1982)); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). Although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately "'a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.'" *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

## VI.    DISCUSSION

### a.    Plaintiff's Claims

Plaintiff claims that the ALJ erred in a number of ways: (1) The ALJ's physical RFC Assessment was not supported by substantial evidence; (2) The ALJ committed reversible error by failing to properly utilize the factors set for in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assessing the weight to be given the opinion evidence regarding Plaintiff's mental health condition; (3) The ALJ did not properly undertake consideration of Plaintiff's credibility; (4) The ALJ did not complete the record; and (5) The ALJ did not properly assess Plaintiff's mental disorders in terms of their severity.  The Court will examine each of these claims.

### 1.  ALJ's Physical Residual Functional Capacity Assessment

The ALJ concluded that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she "can perform handling and fingering frequently, defined as up to two-thirds of the workday, but not continuously (repetitively)."  Plaintiff asserts that the ALJ's finding that Plaintiff could perform light work, with frequent, but not continuous, handling and fingering, was not supported by substantial evidence.  Plaintiff further argues that the ALJ misconstrued "repetitive" to mean "continuous," and that "[i]t is clear that the physicians all opined that the use of her hands would be 'occasional,' at best; and that 'repetitive' would cover both 'frequent' and 'constant.'" P. Br. at 4.  The Commissioner argues that the ALJ's determination is supported by substantial evidence and is a proper limitation in light of Plaintiff's condition.

## A. Substantial Evidence for the Physical RFC?

To determine whether substantial evidence exists in the record, the Court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp.2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S .Ct. 1207, 75 L.Ed.2d 447 (1983)).

As indicated above, the ALJ's physical RFC is based upon the opinions and treatment notes of the doctors who examined Plaintiff. Plaintiff's treating physician, Dr. Kadura, who the ALJ gave some weight,[4] found that Plaintiff had no limitation in sitting, walking and standing, and could occasionally lift and carry as much weight as tolerated but was limited from performing repetitive motions to the wrist. (Tr. 346). Dr. Kadura's opinion was consistent with the treatment notes of Dr. Imtiaz Samad, who found in October 2009 that Plaintiff "was in no acute distress, her neck was supple with good range of motion, examination of her wrists showed no effusion or inflammation, she was able to extend her wrist joints with minimal discomfort and radially and ulnar deviate her wrists with no

---

[4]The ALJ afforded little weight to Dr. Kadura's October 2008 opinion, when the doctor included a prohibition on prolonged sitting or standing, because these prohibitions were not supported by the objective evidence. The ALJ concluded: "The opinion was not supported by the medical evidence and is not consistent with other credible evidence as the claimant is not diagnosed with any impairment that would limit her ability to sit or stand."

significant pain.  Finklestein['s test] was only minimally positive.  Her handgrip was normal bilaterally, and the strength in her upper limbs was 5/5." (Tr. 438).

Dr. Kadura's opinion was also consistent with the opinions of the doctors who treated Plaintiff in connection with her Worker's Compensation claim, the findings and opinion of the consultative examiner, and the opinion of the State agency medical consultant.  Accordingly, the ALJ reasonably gave Dr. Kadura's opinion some weight (Tr. 37).  *See* 20 C.F.R. § 404.1527(d), 416.927(d).

The ALJ also gave significant weight to the Plaintiff's examining and/or treating sources, Drs. Samad, Smiley, Sugarman, and Fatti, who all determined that Plaintiff could work, although some placed limitations of no repetitive handwork or heavy lifting.   Dr. Smiley released Plaintiff back to work at "light duty" on May 26, 2006 (Tr. 276).  Dr. Sugarman opined that Plaintiff could not return to work "full duty," but had only restrictions for no repetitive activities or heavy lifting (Tr. 261).  On examination by Dr. Fatti in August 2007, Plaintiff demonstrated normal gross motor strength and good wrist strength (Tr. 337, 340).  Finkelstein's test, Tinel's test, and Phalen's test were all negative (Tr. 340).  Additionally, Plaintiff demonstrated full range of motion in the fingers, full supination and pronation of the wrist, "mildly" decreased wrist flexion and extension, and full range of motion in the cervical spine and shoulders (Tr. 336, 340).  Plaintiff's sensation to light touch was normal throughout her upper extremities, and reflexes were normal (Tr. 337).  Dr. Fatti stated on October 22, 2007 that he would allow Plaintiff to try to work at full duty,

but noted that heavy, repetitive activities might be difficult for either wrist (Tr. 334).[5]

The ALJ also gave significant weight to the opinion of consultative examiner, Dr. Ganesh. (Tr. 38). Dr. Ganesh conducted a physical examination that revealed full range of motion in Plaintiff's spine and all extremities, full strength in the extremities, intact reflexes, and no sensory or motor deficits (Tr. 357). The consultative examination revealed full grip strength, intact hand and finger dexterity, and no gross abnormalities (Tr. 357). During the examination, Plaintiff was able to tie a bow, fasten a button, zip a zipper, and open and close Velcro with no gross difficulties (Tr. 357). Dr. Ganesh opined that Plaintiff had no physical limitation for sitting, standing, or walking, but had some mild to moderate limitation with repetitive hand work (Tr. 358). Given the doctor's benign examination findings, and the consistency of Dr. Ganesh's opinion with the treatment notes and the opinions of Drs. Samad, Kadura, Smiley, Sugarman, and Fatti, the ALJ reasonably accorded Dr. Ganesh's opinion significant weight. 20 C.F.R. § 404.1527(d), 416.927(d).

A State agency medical consultant, Dr. DiBella, reviewed the medical evidence of the record available on May 14, 2008 and opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, sit, stand, and/or walk up to six hours each in an eight hour day. (Tr. 368). The doctor further noted that Plaintiff had mild to moderate limitations with repetitive hand work. (Tr. 369). A State agency consultant's opinions may constitute substantial evidence if, as here, they are supported by the evidence in the record. 20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p.

_____

[5]The ALJ properly gave these doctors' opinions significant weight because they were consistent with one another and with the evidence of record. 20 C.F.R. § 404.1527(d), 416.927(d).

At an independent medical examination by Dr. Daniel Carr in December 2006, Plaintiff demonstrated full range of motion in her wrist, fingers, elbow, and cervical spine, and she had no obvious swelling in her hands (Tr. 266). Tinel's test and Phalen's test were negative, and Plaintiff had no objective sensory or motor deficit (Tr. 267). Further, Dr. Carr reviewed the MRI performed on November 20, 2006 and stated that it showed only some mild disc desiccation in the mid-cervical spine at C4-5 and C5-6, but no disc herniation and no nerve compression (Tr. 267).

Based on the evidence presented in this matter, the Court finds that there existed substantial evidence for the conclusion that Plaintiff suffered from a physical condition that required mild or moderate limitation on work activities involving the repetitive use of her wrist and fingers. *See evidence from* Drs. Kadura ("was limited from performing repetitive motions to the wrist"); Samad (no effusion or inflammation of wrists; able to extend wrist joints with minimal discomfort and radially and ulnar deviate wrists with no significant pain; Finklestein's test was only minimally positive; handgrip normal bilaterally; strength in upper limbs 5/5); Smiley (released Plaintiff back to work at "light duty"); Sugarman (could not return to work "full duty," but with restrictions on repetitive activities or heavy lifting); Fatti (demonstrated normal gross motor strength and good wrist strength; Finkelstein's test, Tinel's test, and Phalen's test all negative; demonstrated full range of motion in the fingers, full supination and pronation of the wrist, "mildly" decreased wrist flexion and extension, and full range of motion in the cervical spine and shoulders; sensation to light touch was normal throughout her upper extremities; reflexes normal; work at full duty, but heavy, repetitive activities might be difficult for either wrist ); Ganesh (intact hand and finger dexterity; full (5/5) grip strength; able to tie a bow, fasten a button, zip a zipper, and

23

open and close Velcro with no gross difficulties; no physical limitation for sitting, standing, or walking, but mild to moderate limitation with repetitive hand work); DiBella (mild to moderate limitations with repetitive hand work); Carr (full range of motion in her wrist, fingers, elbow, and cervical spine, and no obvious swelling in hands; Tinel's test and Phalen's test were negative; no objective sensory or motor deficit; MRI performed on November 20, 2006 showed only some mild disc desiccation in the mid-cervical spine at C4-5 and C5-6, but no disc herniation and no nerve compression). The ALJ's finding that Plaintiff could perform light work with frequent but not continuous handling or fingering is supported by substantial evidence. The Court refrains from substituting its own conclusion for that of the ALJ.

### B. Correct Legal Conclusion

The next question is whether the ALJ applied the correct legal standard in determining that Plaintiff "can perform handling and fingering frequently, defined as up to two-thirds of the workday, but not continuously (repetitively)." Plaintiff argues that the ALJ misconstrued "repetitive" to mean "continuous," and that "'repetitive' would cover both 'frequent' and 'constant.'" P. Br. at 4. The Court disagrees that the ALJ misdefined these terms.

"Frequent" is defined under the regulations as occurring from one-third to two-thirds of the time, while "occasional" refers to activity that occurs up to one-third of the time. SSR 83–10; *Castle v. Commissioner of Social Sec.* 2014 WL 2215759, at *2, n. 6 (N.D.N.Y. May 29, 2014). "Continuous" is generally defined in the Social Security context as being more than two-thirds of the time. *See Lynn v. Commissioner of Social Sec.*, 2013 WL 1334030, at *7, n. 4 (E.D.N.Y. March 30, 2013). "Handling" involves "[s]eizing, holding,

grasping, turning or otherwise working with hand or hands." *Olmeda v. Barnhart*, 2006 WL 2255003, at *5, n. 11 (S.D.N.Y. 2006)(citation omitted). With regard to "handling," "[f]ingers are involved only to the extent that they are an extension of the hand, such as to turn a switch...." *Id.* "Fingering" means "[p]icking, pinching, or otherwise working primarily with fingers rather than with the whole hand or arm as in handling." *Id.*

For the reasons set forth above, substantial evidence supports the ALJ's determination that Plaintiff could do handling and fingering up to two-thirds of the time. There is also no indication that the ALJ improperly applied the terms he used in arriving at Plaintiff's physical RFC. "[A]lthough the ALJ could have more fully articulated the basis for his conclusion that [Plaintiff] was capable of frequent handling or fingering, [the Court] conclude[s] that his failure to do so is harmless because the RFC assessment is supported by substantial evidence in the record." *Gladney v. Astrue*, 2014 WL 3557997, at *10 (W.D.N.Y. July 18, 2014)(citations omitted). Accordingly, Plaintiff's challenge to the ALJ's physical RFC determination is rejected.

### 2. ALJ's Assessment of Weight of Opinion Evidence and Assessment of Severity of Plaintiff's Mental Disorder

In point 2, Plaintiff argues that the ALJ did not properly utilize the criteria set forth in 20 C.F.R. §§ 404.1527 and 416.927 when determining the weight which should be given to medical opinion evidence presented. In point 5, Plaintiff argues that the ALJ did not appropriately weigh the evidence when examining the severity of Plaintiff's mental impairment. Plaintiff contends that the ALJ's mental RFC finding is not supported by substantial evidence because the ALJ erred in failing to accord significant weight to the opinions of the consultative examiner, Dr. Jeanne Shapiro, and Plaintiff's treating

psychiatrist, Dr. Thomas Schwartz. Plaintiff also alleges error by the ALJ for failing to provide appropriate reasoning for discrediting the more substantial limitations expressed by Plaintiff's treating psychiatrist, and only providing significant weight to portions of Dr. Schwartz's opinion. Upon examination of the record, the Court rejects Plaintiff's arguments.

The ALJ considered the medical opinions regarding Plaintiff's mental functioning and reasonably accorded significant weight to Dr. Schwartz's opinion that Plaintiff had no limitation for understanding, remembering, and carrying out simple instructions; mild limitations in the ability to make judgments and simple work-related decisions; and moderate limitations in the ability to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with coworkers, and respond appropriately to usual work situations and to changes in a routine work setting (Tr. 38; *see* Tr. 516-17). 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This opinion is supported by Dr. Schwartz's treatment notes, which revealed that Plaintiff was cooperative, with no abnormal movements, no hallucination or delusions, intact attention and concentration, organized thought processes, and fair-to-good insight and judgment (*see* Tr. 311, 318-19, 321, 322, 325, 327, 476, 478, 479, 481, 486, 488, 491, 495, 508, 513).

The ALJ also gave weight to the opinion of the State agency psychological consultant, Dr. T. Harding, who reviewed the medical evidence of record available as of May 20, 2008, and opined that Plaintiff demonstrated only mild-to-moderate limitations, which might impose some limitation on work function, but which would not be expected to preclude Plaintiff from performing all work (Tr. 390; *see* Tr. 388-89). Dr. Harding's opinion was supported by Dr. Schwartz's treatment notes, which included repeatedly normal

mental status examinations (see Tr. 311, 318-19, 321, 322, 325, 327, 476, 478, 479, 481, 486, 488, 491, 495, 508, 513). Further, Dr. Harding's opinion that Plaintiff had no more than moderate limitations is supported by assessments of Dr. Schwartz and treating therapist Xenia Becher, who found that Plaintiff had a Global Assessment of Functioning of 60, indicating moderate symptoms or moderate difficulty in social, occupational or school functioning (Tr. 465, 513). *See* Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., rev. 2000).[6] The opinions of state agency psychologists, like Dr. Harding, may constitute substantial evidence where, as here, they are supported by evidence in the record. 20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p; Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995).

The ALJ's determination to give Dr. Shapiro's opinions little weight was proper because the opinions was based entirely on Plaintiff's subjective statements and was inconsistent with the doctor's benign examination findings (Tr. 37-39).[7] *See Francese v.*

_____

[6]A GAF of 51 to 60 indicates a person with moderate symptoms or moderate difficulty in social, occupational or school functioning. A GAF of 61-70 indicates a person with some mild symptoms or some difficulty in social, occupational, or school functioning, but who is generally functioning pretty well and has some meaningful interpersonal relationships. *DSM-IV-TR*, 34 (4th ed., rev. 2000).

[7]When explaining the reasoning for affording Dr. Shapiro's opinion little weight, the ALJ wrote:

Jeanne Shapiro, Ph.D., examined the claimant for the Administration in April 2008(Exhibit 12F). The claimant told Dr. Shapiro that she had difficulty sleeping, decreased appetite, was unmotivated and lethargic, did not go anywhere or do anything, isolated from others, had poor concentration and memory, was easily angered and yelled, screamed, threw things, broke things, and wanted to hurt people. However, the mental status examination was basically unremarkable. Dr. Shapiro noted that the claimant did not report any significant manic or anxiety-related symptoms, or symptoms of formal thought disorder.

As for the opinion evidence, the weight of the evidence does not support the severity alleged. Under SSR 06-3p, the undersigned reviewed and considered the reports prepared in regard to obtaining VESID services (Exhibits 20F, 15F, and 26F). Little weight is given to those reports because the medical information provided is inconsistent with the objective medical evidence and the determination of disability is an issue reserved to the Commissioner (SSR 96-5p).

(continued...)

27

*Shalala*, 897 F. Supp. 766, 771 (S.D.N.Y. 1995) (treating doctor's opinion was not owed controlling weight because it was not well-supported by objective medical findings, it was inconsistent with other medical opinions, and it was based largely on the plaintiff's subjective statements). For instance, while Dr. Shapiro opined that Plaintiff might have some difficulty understanding and following instructions due to complaints of memory and concentration deficits, the mental status examination revealed that Plaintiff's attention and concentration and recent and remote memory skills were intact (Tr. 361). Further, while Dr. Shapiro opined that Plaintiff might have some difficulty interacting appropriately with others, Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate (Tr. 361). Still further, and for the reasons discussed below with regard to Plaintiff's credibility, the ALJ properly gave little weight to Plaintiff's subjective complaints.

The ALJ also properly found that Dr. Shapiro's opinion was too speculative in that the doctor opined that Plaintiff "may have" difficulty in certain areas and did not define the degree of that difficulty (Tr. 361). It was not error to decline to rely on such a vague and

---

[7](...continued)
(Tr. 38).

Further, the ALJ stated:

Dr. Shapiro stated that the claimant may have difficulty adequately understanding and following some instructions and directions as well as completing some tasks based on the claimant's complaints of memory and concentrations deficits, and may have difficulty interacting appropriately with others due to irritability and anger, and may have difficulty attending work or maintaining a schedule due to lack of motivation and lethargy (Exhibit 12F). The doctor also stated that the claimant did not appropriately manage stress. Little weight can be given to Dr. Shapiro's opinion because it is too speculative. More weight is given to the opinion of the reviewing psychologist at the State Agency level, who determined that the claimant had mild to moderate limitations that would not preclude the claimant from performing all work activity. (Exhibit 16F).

(Tr. 38).

28

speculative opinion. *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), *superceded by regulation on other grounds by*, 20 C.F.R. § 404.1560(c)(2).  Thus, the ALJ reasonably afforded little weight to Dr. Shapiro's opinion (Tr. 38).  20 C.F.R. § 404.1527(d), 416.927(d).

The ALJ also properly afforded little weight to Dr. Schwartz's opinion that Plaintiff had marked limitations in interacting appropriately with supervisors and the public (Tr. 39; *see* Tr. 517).   As the ALJ noted, Dr. Schwartz's treatment notes did not support marked limitations (Tr. 39).  For instance, while Plaintiff sometimes reported symptoms of irritability and anger, she did not report any altercations with members of the general public or people in positions of authority (*see* Tr. 311-28, 476-513).  Further, Plaintiff testified that she never had trouble in the past dealing with supervisors and would not have trouble now if a supervisor gave her instructions on what to do and how to do it (Tr. 82).[8]  Additionally, Dr. Schwartz's opinion was inconsistent with the opinion of the State agency psychologist, Dr. Harding (see Tr. 389). Thus, the ALJ reasonably gave little weight to Dr. Schwartz's opinion that Plaintiff would have marked limitations in interacting appropriately with supervisors and the public. 20 C.F.R. § 404.1527(d), 416.927(d); *see Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir.  2012) (finding that it was not error for the ALJ to give greater weight to the opinion of the state agency physician than to the treating source's opinion); *Kiggins v. Barnhart*,  2004 WL 1124169, *12 (S.D.N.Y. May 20, 2004) (affirming where the ALJ found that the opinions of the state agency physicians and consulting physicians were consistent with the evidence of record and therefore should override the opinion of the

_____

[8]Plaintiff's contention that the ALJ should have disregarded her own testimony regarding her ability to interact with supervisors is unpersuasive. P. Br. at 11.  In fact, Plaintiff elsewhere argues that her testimony should have been given more weight. See P. Br. at 13-18.

treating physician).

Based on the foregoing, the Court finds that the ALJ reasonably found that Plaintiff could perform the basic mental demands of unskilled work.

### 3. Plaintiff's Credibility

Next, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's credibility. The Court does not agree.

An ALJ has discretion to evaluate the credibility of a claimant and to make an independent judgment based on medical findings regarding the true extent of the claimant's symptoms. *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). It is the function of the Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Caroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995)(An ALJ's determination with respect to the credibility of witnesses is given great deference because the ALJ heard the testimony and observed the demeanor of the witnesses). Further, Plaintiff must produce appropriate, probative evidence in support of any subjective statements of symptoms, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4), and the ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous. *Centano v. Apfel*, 73 F. Supp. 2d 333, 338 (S.D.N.Y.1999). "An ALJ's evaluation of Plaintiff's credibility is entitled to great deference if it is supported by substantial evidence." *Nelson v. Astrue*, No. 5:09-CV-00909, 2010 WL 3522304, at *6 (N.D.N.Y. Aug. 12 2010).

When an individual has a medically determinable impairment that could reasonably

be expected to produce the symptoms alleged, but the objective evidence does not substantiate the alleged intensity and persistence of the symptoms, the ALJ considers other factors in assessing the individual's subjective symptoms. These factors include: (1) Plaintiff's daily activities; (2) the nature, duration, frequency and intensity of his symptoms; (3) precipitating and aggravating factors; (4) the type of medication and other treatment or measures which Plaintiff uses to relieve his symptoms; (5) treatment other than medication Plaintiff has received for relief of symptoms; (6) any other measures used by Plaintiff to relieve symptoms; and (7) other factors concerning Plaintiff's functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

Contrary to Plaintiff's contention, the ALJ cited significant evidence to explain why Plaintiff's subjective statements were not fully credible. The ALJ first considered whether the objective medical evidence supported Plaintiff's statements (Tr. 24). 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-4p, 96-7p.  The ALJ noted that while the medical evidence indicated underlying impairments that could cause some of the alleged symptoms, the record did not support Plaintiff's allegation that her symptoms were disabling (Tr. 34-35).  In particular, the ALJ cited the multiple benign physical examination findings by Drs. Sugarman, Battista, Carr, Simley, Ljaamo, Fatti, Ganesh, and Samad (Tr. 35-36; *see e.g.*, Tr. 261, 265-69, 270-81, 282-84, 287-90, 331-41, 355-58, 421-28, 438). The ALJ further noted that mental status examinations were largely normal and were therefore inconsistent with her allegations of a disabling mental impairment (Tr. 36-37; *see* Tr. 308-28, 464-513). The ALJ also noted that Plaintiff reported improvement in her symptoms with treatment and medication (Tr. 476, 479, 486).

Further, the ALJ pointed out that several medical sources indicated that it appeared

Plaintiff was exaggerating her symptoms (Tr. 34). For instance, Plaintiff's physical therapist noted that "symptom exaggeration seems evident here in the clinic, since patient is independently driving, and independently completing personal ADL's." (Tr. 253). Likewise, at a function test performed in 2010 at the request of Plaintiff's treating physician, Dr. Samad, Plaintiff exhibited "very poor effort or voluntary submaximal effort which is not necessarily related to pain, impairment, or disability." (Tr. 531). The physical therapist noted that Plaintiff's grip test results were inconsistent with her observations of Plaintiff's handling and her driving (Tr. 531). The ALJ also pointed out that Dr. Carr observed that Plaintiff gave "obvious submaximal effort" on the grip strength examination, and the doctor noted that the results were inconsistent with Plaintiff's handshake (Tr. 267).

The ALJ also found that Plaintiff's daily living activities reflected on the assessment of Plaintiff's credibility. The ALJ noted that Plaintiff performed a wide range of daily activities, as explained above, including: caring for her personal hygiene, cleaning, laundry, shopping, driving, and some cooking. (*see e.g.,* Tr. 362). Plaintiff also reported that she is capable of walking her dog, but with great pain. (Tr. 32). Evidence that Plaintiff is capable of engaging in varied activities despite allegations of severe pain is supportive of a conclusion that Plaintiff's alleged pain, although perhaps present, is not disabling. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (ALJ found Poupore's subjective complaints of pain not fully credible when evidence showed that he cared for his one-year old child, including changing diapers, occasionally washed dishes, vacuumed, and drove, watched television and used the computer); *Rivera v. Harris*, 623 F.3d 212, 216 (2d Cir. 1980) (ALJ considered plaintiff's own testimony, including statements that despite pain, plaintiff was able to cook, sew, wash, and shop, although slowly, and with an afternoon

break).  Further, Plaintiff's physical therapist indicated that Plaintiff's ability to drive and perform activities of daily living independently were inconsistent with her complaints and suggested symptom exaggeration (Tr. 253).  Accordingly, the ALJ reasonably concluded that these daily activities belied Plaintiff's allegations of disability (Tr. 34).

Finally, Plaintiff's arguments that she should have been found credible because she made consistent attempts to obtain medical care, because she had prior work, and because her failure to treat her arm and wrist conditions were because of difficulties with insurance coverage, are unavailing. These are merely some of the factors that the ALJ must consider when evaluating credibility. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). Here, the ALJ considered all the relevant factors, including Plaintiff's inconsistent statements, lack of effort at examinations, and exaggeration of her symptoms, and reasonably found that she was not fully credible (Tr. 34).  This finding is supported by substantial evidence.

The medical and non-medical evidence, including Plaintiff's statements about her activities and functional abilities, did not support her allegations of inability to work.  The ALJ properly concluded that Plaintiff's allegations of disability were not entirely credible because they were inconsistent with the objective medical evidence and with her activities of daily living. The Court finds that the ALJ's determination of Plaintiff's credibility was supported by substantial evidence in the record and does not constitute a basis for reversal or remand.

### 4. Was the Record Fully Developed?

The Plaintiff argues that the ALJ failed to develop the record in two specific instances.  First, Plaintiff argues that the ALJ should have contacted Dr. Schwartz for

33

clarification on any inconsistencies of his notes and the severity level which Dr. Schwartz

attributes to Plaintiff. Second, Plaintiff asserts that the determination made by the ALJ

that the Plaintiff had the RFC to perform light work and could perform handling and

fingering frequently is not based on substantial evidence thereby requiring further

evidence. The Commissioner asserts that there were no obvious gaps in the record and,

therefore, the ALJ was under no obligation to obtain more information. The Court agrees

with the Commissioner.

The ALJ has an affirmative duty to assist a claimant in developing the record

regardless of whether the claimant is represented by an attorney. *Perez*, 77 F.3d at 47;

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citing *Pratts v. Chater*, 94 F.3d 34, 37

(2d Cir. 1996) and *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d

Cir. 1982)). But, where there are no obvious gaps in the administrative record and the ALJ

possesses a complete medical history, the ALJ is under no obligation to obtain more

information. *Rosa v. Callahan*, 168 F.3d 72, 79, fn. 5 (2d Cir. 1999). Under the

regulations in effect at the time of the ALJ's decision, re-contacting a source was required

only where the ALJ did not have adequate evidence to determine whether the claimant

was disabled. 20 C.F.R. §§ 404.1512(d), 416.912(e) (2010) (amended March 26, 2012)

("When the evidence we receive from your treating physician or psychologist or other

medical source is inadequate for us to determine whether you are disabled, we will need

additional information to reach a determination or a decision.").

The ALJ possessed a complete medical history, including comprehensive treatment

notes,[9] and thus there existed had no further obligation to develop the record. <u>Rosa</u>, 168 F. 3d at 79, fn. 5 (where there are no obvious gaps in the administrative record and where the ALJ possess a complete medical history, the ALJ has no obligation to obtain more information). Moreover, as set forth above, substantial evidence supported the ALJ's conclusion that Plaintiff could perform frequent handling and fingering.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **DENIED**, Defendant's motion for judgment on the pleadings is **GRANTED**, and the Court **AFFIRMS** the final decision of the Commissioner.

**IT IS SO ORDERED.**

Dated: August 13, 2014

Thomas J. McAvoy
Senior, U.S. District Judge

---

[9]The ALJ considered over 300 pages of treatment records, Workers' Compensation records, and consultative reports (see generally Tr. 246-544).